# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

**UNDERGROUND RAILROAD HISTORY**
**PROJECT OF THE CAPITOL REGION**

194 Livingston Avenue
Albany, NY 12210

Civil Case No.: ___1:26-cv-447___ (AMN/PJE)

*Plaintiff,*

v.

COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

**NATIONAL ENDOWMENT FOR THE HUMANITIES**

400 7th Street, SW
Washington, DC 20506

**MICHAEL MCDONALD**

in his official capacity as
Acting Chair of the National Endowment for Humanities;

**DEPARTMENT OF GOVERNMENT EFFICIENCY**

736 Jackson Place, NW
Washington, DC 20503

**AMY GLEASON**, in her official capacity as
Acting Administrator of the
Department of Government Efficiency;

**OFFICE OF MANAGEMENT AND BUDGET**

725 17th Street, NW
Washington, DC 20503

**RUSSELL VOUGHT**, in his official capacity as
Director of the Office of Management and Budget

Defendants.

The Plaintiff, Underground Railroad History Project of the Capital Region, Inc., dba Underground Railroad Education Center ("URHP"), by its undersigned counsel, alleges as follows:

**<u>INTRODUCTION</u>**

1. URHP was founded in Albany, New York's Arbor Hill neighborhood to bring to light the historic connections of its 19th century Black residents to the Underground Railroad movement and civil rights activism. URHP has become a community anchor in a majority Black, economically disinvested neighborhood. It has purchased and restored a historic home central to the Underground Railroad movement owned by 19th century Black abolitionists Stephen and Harriet Myers ("Myers Residence") and has cultivated green spaces in vacant lots where other such homes once stood. It conducts house and walking tours of its properties in Albany and Troy, as well as educational programs for youth, families, and adults. URHP has participated in local archaeological excavations and collects and preserves material cultural artifacts and documents.

2. Central to its mission, URHP interprets the Underground Railroad movement as a civil rights movement propelled toward social and racial justice. Not merely a matter of historical interest, URHP teaches that the movement, and the people at its center, are a source of pride and lessons for contemporary struggles for equality and opportunity.

3. In May 2023, URHP applied for a National Endowment for the Humanities ("NEH") Challenge Grant of $250,000 to support the construction of an Interpretive Center to expand its educational programming and to house its collections and staff operations. URHP's archives, affiliations, and programming have grown dramatically since its founding. Its collection has grown to over 27,000 pieces. Currently, tours are given, artifacts are stored, and all operations

are based in its ten-room Stephen and Harriet Myers Residence in Arbor Hill. The Interpretive Center would provide 13,000 square feet of additional space next to the Myers Residence, in three floors accessible by elevator. The Interpretive Center was to be a facility fully dedicated to programs, events, exhibits, video documentary production and viewing, research, staff development, and a children's center, all focusing on the Underground Railroad moment. The new facility would enable URHP to expand its outreach exponentially and to share its empowering reinterpretation of Underground Railroad history and its relevance for today.

4.  URHP's proposal was an ideal NEH project. NEH was established by Congress in 1965 to support humanities work throughout the country. Its statutory mission is to reach underserved populations and support diverse viewpoints – precisely URHP's mission and the purpose of the Interpretive Center. URHP's proposal was also closely aligned with NEH's special initiative, "American Tapestry: Weaving Together Past, Present, and Future," referenced in the Challenge Grant's Notice of Funding Opportunity. This initiative intended to amplify untold stories of historically underrepresented groups to build a more just and equitable society.

5.  NEH subjected all Challenge Grant applications to a competitive vetting process. Expert panels reviewed each proposal, which were then reviewed by the 26-member National Council on Humanities. Following this exhaustive process, NEH approved funding of $250,000 for the Interpretive Center over a two-year period, subject to URHP meeting NEH fundraising and reporting conditions.

6.  URHP accepted NEH's funding offer in February 2024 and met every funding obligation over the course of the next fifteen months.

7.  As URHP was laying the groundwork for the construction of its Interpretive Center, Donald Trump was elected President. Following his inauguration, President Trump sought to shift

3

dramatically the mission of NEH to support his administration's ideological goals. On his first day in office January 20, 2025, President Trump issued Executive Orders ("EO") requiring, among other directives, that federal agencies eliminate all operations and funding supporting "diversity, equity, and inclusion" ("DEI") initiatives within sixty days.

8. On February 7, 2025, NEH issued a high-level agency directive to review grant awards issued under the Biden Administration, attaching a spreadsheet of grant awards with instructions to score grants for termination that could be deemed to violate President's EOs. ("February 7 Directive"). The Trump Administration's Department of Government Efficiency ("DOGE") became closely involved with the grant terminations process, advising the new Acting Chair Michael McDonald ("McDonald") and meeting with NEH administrators as they reviewed grants for termination.

9. Over 1,400 grants supporting research and education humanities programs were terminated in early April 2025 — pursuant to the February 7 Directive — for their conflict with President Trump's EOs and the new agency priorities adopted in their wake. These terminations included over 100 grants concerned with Black history and culture, as well as hundreds of grants supporting projects in Native American history, culture, and languages, and Hispanic history and culture.

10. Upon information and belief, open Challenge Grants, including the award offered to URHP, were in a second group of awards targeted in the weeks following the initial mass terminations in April 2025. On May 14, 2025, URHP received a communication that its award was being withdrawn ("the Withdrawal").

11. In light of the discriminatory criteria applied to the mass terminations in April 2025, it is apparent that NEH withdrew its funding offer because URHP's Interpretive Center would

increase the public's knowledge and understanding of the Underground Railroad movement – a movement focused on freedom and equality for African Americans. This goal was deemed to contravene the Trump administration's mandate to divest the federal government of all support for DEI. NEH and DOGE withdrew the offer in order to suppress URHP's viewpoint and to divest, as it had done systematically, its support for Black history research and programs.

12.     Further, the Withdrawal was the result of a high-level agency decision adopted in contravention of NEH's statutory mandates and its own regulations requiring it to support diverse viewpoints and reach underserved populations

13.     URHP challenges the Withdrawal on the basis that: it was the result of unconstitutional viewpoint discrimination in violation of the First Amendment; it was racially discriminatory and, therefore, deprived URHP of equal protection of the law under the Fifth Amendment; and it was the result of a high-level agency decision that contravened the Administrative Procedure Act ("APA").

14.     URHP seeks an order declaring the Withdrawal unconstitutional and setting aside the February 7 Directive that caused the Withdrawal. URHP has suffered concrete financial, professional, and other harms from the Withdrawal, and will continue to suffer harm on an ongoing basis absent declaratory and injunctive relief.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court

may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and URHP is incorporated in the State of New York and has its principal place of business in this District, where the resulting harm to URHP has occurred and will continue to occur unless enjoined.

### PARTIES

17.     URHP is a 501(c)(3) nonprofit corporation, having been incorporated under the laws of the State of New York in 2003. At all relevant times, URHP's principal place of business was and still is located at 194 Livingston Avenue in the City and County of Albany in the State of New York.

18.     URHP researches and preserves the local and national history of the well-known Underground Railroad movement,[1] its international connections, and its legacy to today's social justice issues, thereby empowering people of all ages to be agents of change in favor of an equitable and just society.

19.     The New York State Education Department's Board of Regents issued a provisional charter on February 11, 2003, and then an absolute charter on October 27, 2015, on the basis that URHP is a historical society with collections satisfying the Board of Regents standards of organizational and educational quality.

---

[1] The Underground Railroad was a system existing in the Northern states before the Civil War by which enslaved persons who escaped from the South were secretly helped by sympathetic Northerners -- in defiance of the Fugitive Slave Acts -- to reach places of safety in the North or in Canada.

20.     Defendant NEH is a federal agency headquartered in Washington, D.C.

21.     Defendant Michael McDonald is the Acting Chair of NEH and is sued in his official capacity.

22.     Defendant Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.

23.     Defendant Russell Vought is the Director of the OMB and is sued in his official capacity.

24.     Defendant Department of Government Efficiency is an organization within the Executive Office of the President and headquartered in Washington, D.C.

25.     Defendant Amy Gleason is the Acting Administrator of DOGE  and is its highest ranking official. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.     The Establishment, Structure and Priorities of NEH

26.     Congress created NEH in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA"). Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

27.     Congress established NFAHA to ensure that arts and humanities were not left behind as the nation focused on scientific progress. As laid out in the enabling statute, a "high civilization must not limit its efforts to science and technology alone but must give full value and support to the other great branches of man's scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future." 20 U.S.C. § 951(3). Congress further explained that it was necessary and appropriate for the federal

government to create and sustain a "climate encouraging freedom of thought, imagination, and inquiry." *Id.* at (4).

28. In the sixty years since NFAHA's passage, Congress has repeatedly reaffirmed its commitment to these goals. Last updated in 1990, the enabling statute makes clear that the "humanities belong to all people of the United States," 20 U.S.C. § 951(1), and that "[d]emocracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make people of all backgrounds and wherever located masters of their technology and not its unthinking servants." Id. at § 951(4).

29. Congress created NEH and its sister agency the National Endowment for the Arts ("NEA") so that Americans could understand "the diversity of excellence that comprises our cultural heritage." *Id.* at 951(9). The Federal Government should complement, assist, and add to State, regional, local, and private agencies and organizations for the advancement of the humanities and the arts. 20 U.S.C. § 951(5).

30. The NEH Chairperson must "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community," and "insure [*sic*] that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons." 20 U.S.C. § 956(c)(4) & (9).

31. The Chairperson is specifically charged with reaching "traditionally underserved recipients of federal financial assistance," and is "authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance" to effectuate these goals. 20 U.S.C. § 956(c). In selecting recipients of funding, NEH's Chairperson "shall give particular regard to

scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c)(10).

32. Congress's directives for NEH thus specifically require it to support diverse and underrepresented viewpoints, and to expand the reach of NEH-funded humanities programs. In other words, congressional intent was to ensure that what is now sometimes short-handed as "DEI" and branded by Defendants as illegal and undesirable, would be central to NEH's mission. It is Congress's actual mandate for the agency. This mandate was carried out for 60 years, under Democratic and Republican administrations, until upended this past Inauguration Day.

33. Congress's commitment to funding humanities initiatives that mirror the breadth and diversity of American culture is also clear in the statutory structure of the grant-making process. Under the statute, the Chairperson of the NEH determines funding "with the advice of the National Council on the Humanities." 20 U.S.C. § 956(c). ("The Council.")

34. The Council is comprised of 26 members appointed by the President, "selected from among private citizens of the United States who are recognized for their broad knowledge of, expertise in, or commitment to the humanities," and who will "provide a comprehensive representation of the view of scholars and professional practitioners in the humanities and of the public throughout the United States." 20 U.S.C. § 957(b). In making appointments, "the President shall give due regard to equitable representation of women, minorities, and individuals with disabilities who are involved in the humanities." *Id.*

35. The Council serves as a safeguard to insulate NEH's funding decisions from political interference and to ensure diversity is reflected in its decisions. NEH's Chairperson "shall not approve or disapprove any such application [for funding] until the Chairperson has received the recommendation of the Council." *Id.* at § 957(f).

36.     NEH's other statutory functions include providing funding to:

a.     develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

b.     initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

c.     initiate and support training and workshops in the humanities by making arrangements with institutions or individuals;

d.     foster international programs and exchanges;

e.     foster the interchange of information in the humanities;

f.     foster, with groups, education in -- and public understanding and appreciation of -- the humanities;

g.     support the publication of scholarly works in the humanities;

h.     foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

20 U.S.C. § 956.

37.     Requirements ensuring diversity in grant awards are also embedded in NEH regulations. Known as "OMB Uniform Guidance," OMB incorporated requirements ensuring diversity of applicants into its rules governing federal grant awards. NEH formally adopted OMB Uniform Guidance, thus giving it regulatory effect for NEH. 2 C.F.R. § 3374.1. Notices of funding opportunities must "communicate opportunities to the public in plain language to ensure the announcement is accessible to diverse communities of eligible applicants, including underserved communities." 2 C.F.R. § 200.204. Federal agency merit review standards must "provide

opportunities for a diverse group of participants, including those representing underserved communities." 2 C.F.R. § 200.205.

38. For sixty years, NEH carried out its duty to fund research, training, and education that advance the humanities. Since 1965, NEH has been the largest federal funder of the humanities, contributing funding to over 70,000 projects in all 50 states, the District of Columbia, and U.S. territories. Until 2025, NEH awarded over $6.4 billion in grant funds, supporting: humanities education, research, preservation; public programs; the creation of regional humanities centers; and the development of humanities programs under the jurisdiction of state humanities councils.[2] NEH grants have typically been used to support cultural institutions, such as museums, archives, libraries, colleges, universities, and public television and radio, as well as individual scholars.[3] Until 2025, NEH offered 47 grant programs to support humanities work around the country.[4]

39. Prior to January 20, 2025, recipients of NEH funding were selected after a rigorous review process. Every year, NEH recruited over 1,000 experts from every state and organized them into 200 review panels that evaluated roughly 5,700 grant applications. The panels were selected for their expertise in disciplines relevant to the grant programs.[5]

---

[2] National Foundation on the Arts and Humanities: FY2024 Appropriations. Nov. 6, 2024.
[3] *Id*.
[4] In 2025, NEH reduced the number of its grant programs from 47 to 24. Janay Kingsberry, The Washington Post, *NEH Grant to Fight Antisemitism is Largest Ever, Signaling Trump-era Shift,* The Washington Post (Sept. 16, 2025), https://www.washingtonpost.com/entertainment/2025/09/16/neh-grant-tikvah-jewish-civilization-project/.
[5] Nat'l Endowment for the Humanities, *NEH's Application Review Process*, https://www.neh.gov/grants/application-process (last visited Jan. 28, 2025).While this is the process still described on the NEH website, the competitiveness is now in dispute. Certain large grants awarded in January 2026 were reported to be non-competitive; instead, the recipients were selected to apply. Jennifer Schuessler, *Fired Scholars and Big Grants to Favored Projects: Inside Trump's N.E.H.*, N.Y. Times (Nov. 15, 2025).

40. This exacting review proceeded as follows: after a grant application was submitted, it was assigned to a specific peer-review panel based on academic discipline, institutional type, project area, or project type. The evaluators on the panel read all assigned applications and assigned them a rating based on "NEH's published review criteria and program guidelines." These criteria "emphasize humanities significance, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan."[6] After each evaluator assessed the application, the panel would meet to discuss the applications.

41. Next, NEH staff reviewed the panels' work and recommended the most meritorious applications to the Council. The Council would meet three times a year to discuss the applications and finalize recommendations to the Chairperson.[7] The Chairperson made the final funding decisions, taking into account the advice provided throughout the review process.[8]

42. Each year, until 2025, NEH typically made about 900 grants, ranging from approximately $1,000 to $750,000. Across all 47 grant programs, only about 16% of applications received funding.[9] The projects selected for funding by NEH thus represented the best of the best.

43. Congress has repeatedly affirmed its support for NEH's mission, appropriating funds for grant-making every fiscal year.

---

https://www.nytimes.com/2026/01/15/arts/national-humanities-endowment-grants.html. One very large grant to combat antisemitism was awarded despite the Council's recommendation against it; shortly after the announcement, the White House fired all but four Council members. *Id.* McDonald has also announced plans for hundreds of smaller discretionary "chairman's grants," which can be awarded without scholarly review. Jennifer Scheussler, *Fired Scholars and Big Grants to Favored Projects: Inside Trump's N.E.H.,* N.Y. Times (Nov. 15, 2025), https://www.nytimes.com/2025/11/15/arts/national-endowment-humanities-trump.html (further discussing changes to grant-making process).

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

44. In the 2024 Appropriations Act, for example, Congress appropriated $207,000,000 to NEH, with $192,000,000 specifically designated for grants, loans, contracts, and other assistance to further the purposes set forth under 20 U.S.C. § 956(c), and $15,000,000 designated to carry out NEH's "matching grants" program. Pub. L. 118-42, 138 Stat. 25, 281-82 (Mar. 9, 2024).

45. On March 15, 2025, Congress enacted a Continuing Appropriations and Extensions Act, which re-appropriated all of the funds appropriated to NEH under the 2024 Act. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025). NEH thus received another roughly $200 million to spend on grants.

**B.     *NEH's American Tapestry Initiative and Notices of Funding Opportunities.***

46. In March 2022, Shelly C. Lowe ("Lowe"), then Chair of NEH and a Navajo woman, announced an NEH-wide initiative: "American Tapestry: Weaving Together Past, Present, and Future" ("*American Tapestry*").[10] Its purpose was to help Americans study, evaluate and respond to some of the Nation's greatest challenges, among them "sustaining our democratic institutions, building a more just and equitable society, and preparing for and protecting our cultural inheritance from the effects of climate change." NEH would "leverage the humanities to strengthen our democracy, advance equity for all, and address our changing climate."[11]

47. Chair Lowe further stated in the announcement: "As Americans we are the inheritors of a uniquely rich and vibrant history, a magnificent tapestry of diverse cultures, beliefs, experiences, and intellectual movements, bound together by the warp and weft of American ideals

---

[10] Nat'l Endowment for the Humanities, *American Tapestry: Weaving Together Past, Present and Future, https://www.neh.gov/news/american-tapestry-weaving-together-past-present-and-future* (last visited January 12, 2026).
[11] *Id.*

of progress and opportunity. The announcement continued, "*American Tapestry* draws upon the insights of the humanities to help us connect the American future with the American past, and cherish this inheritance for future generations by providing funding for humanities-based programs that foster a thriving democracy, [and] expand opportunity and access for all Americans."[12]

48. The announcement linked the initiative to NEH's purpose in examining the breadth of America's history and its core mission of advancing equity and celebrating its diversity, stating, "The *American Tapestry* initiative takes its inspiration from the agency's founding legislation and the goals it sets forth for the NEH: 'a better understanding of the past, a better analysis of the present, and a better view of the future.'" Core to NEH's mission are "programs that support the fundamental building blocks of American civil society, helping us to strengthen civic engagement, examine the human condition, preserve our cultural heritage and foster mutual respect for diverse beliefs and cultures." The NEH encouraged projects to "build capacity at museums, libraries, archives, historic sites, cultural centers, and colleges and universities, benefitting more communities while amplifying the untold stories of historically underrepresented groups." By supporting humanities projects aligned with the initiative's priorities, "*American Tapestry* will elevate our country's history in all its complexity and diversity." Congress supported this special initiative in its fiscal year 2023 and fiscal year 2024 appropriations for NEH.[13]

49. On February 17, 2023, the NEH Office of Challenge Programs issued its Notice of Funding Opportunity ("NOFO"), "Infrastructure and Capacity Building Challenge Grants: Capital Projects," Funding Opportunity Number: 20230517-CHA, with a due date of May 17, 2023 (the "Capital Projects NOFO"). Ex. A (Notice of Funding Opportunity). The Office of Challenge

---

[12] *Id.*

[13] Congressional Research Services, *National Foundation on the Arts and Humanities: FY2024 Appropriations* (Nov. 6, 2024), https://www.congress.gov/crs-product/R48255.

Programs supports capital projects through a combination of federal matching funds and related fundraising from nonfederal third parties. The grants serve to strengthen the institutional base of the humanities by helping organizations secure and sustain their core buildings, sites, collections, and/or humanities activities for the long term. Of importance to URHP, the Capital Projects NOFO program supported the design and construction of facilities that house humanities collections or are used for humanities activities.

50.     The Capital Projects NOFO referenced *American Tapestry* as background, summarizing the initiative and its encouragement of "projects that explore the untold stories of historically underrepresented groups and build capacity at cultural and educational institutions to benefit underserved communities." The NOFO required that proposals enhance the institution's long-term impact on the humanities and build on careful strategic planning and described the competitive selection process. Expert reviewers would review projects for their significance for the advancement of the humanities, the audiences served, long-range institutional planning and commitment, and fundraising plans.

## C.      *URHP's Application and NEH's Offer of Funding*

51.     On May 11, 2023, URHP submitted its application in response to the Capital Projects NOFO to support its proposed construction of the Interpretive Center for the URHP in the Arbor Hill section of Albany, New York. Arbor Hill is an economically disenfranchised, largely Black neighborhood,[14] still affected by a history of redlining.[15] It is also at the center of important

---

[14] Cedar Lake Ventures, Inc. *Statistical Atlas,* https://statisticalatlas.com/neighborhood/New-York/Albany/Arbor-Hill/Race-and-Ethnicity, updated September 14, 2018 (last visited January 30, 2026). Its demographic reports are based on 2010 data from the US Census Bureau, and the 2012-2016 American Community Survey.

[15] *See,* Massarah Mikati and Eduardo Medina, *A City Divided: How New York's Capital City Was Splintered Along Racial Lines,* Times Union (Special Report), June 6, 2021, https://www.timesunion.com/projects/2021/albany-divided/ (discussing history of redlined

regional history. URHP's application makes clear its longstanding commitment to, and success in, uncovering and preserving the history and related artifacts of the Capital Region Underground Railroad movement; it has developed and shared this powerful narrative and its relationship to the present through its engagement with the community, the greater Capital Region and nationally. Its proposed Interpretive Center promises to expand its audience and its programming, and to preserve and increase access to its historic collections. Such expansion is not only desirable, but a necessity at this point in its operations.

52. As URHP describes in its application narrative, URHP's founders Mary Elizabeth Stewart and Paul Stewart ("the Stewarts") began collaborative research in the late 1990s uncovering the voices of Capital Region Underground Railroad activists. Ex. B (Application Narrative). The Stewarts found that the accepted American narrative of the Underground Railroad failed to recognize the activists' broader vision of a civil rights movement, and their many accomplishments despite discrimination and oppression. Recognizing that their seminal research belonged to the community, and the public's need for this empowering narrative, the Stewarts formed the nonprofit URHP in 2003 and incorporated it under the Regents of the University of the State of New York "with the purpose of taking to the general public the empowering stories of local Black individuals who had worked for justice in the Underground Railroad movement." Also central to its mission "is the collection and preservation of artifacts of material culture, papers, publications, photographs, and other materials related to the movement." The URHP is "charged with the responsibility of preserving our community's Underground Railroad heritage" regionally

---

Albany neighborhoods, including Arbor Hill, and subsequent economic and racial discrimination that has limited opportunities for its Black residents and maintained segregation in the city of Albany).

and nationally, and with conveying "the contemporary relevance of that heritage, as presented through documents, artifacts, buildings and collections."

53. This heritage is displayed and preserved in the Myers Residence, discovered and purchased by URHP in 2004. The Albany Vigilance Committee, an abolitionist committee dedicated to helping freedom seekers, met at the home of these powerful Black abolitionists; the Myerses also sheltered freedom seekers, including those led by Harriet Tubman. URHP raised over $1.3 million to restore the ten-room Greek Revival residence. "An ever-growing number and diversity of individuals and groups visit the Myers Residence to learn and be transformed by the inspiring story of the Underground Railroad from the perspective of Black abolitionists." Visitors also learn about the economic success the Myerses and their peers achieved despite proscriptions and severe restrictions; thus, URHP educates the public about the true history of Black communities. The Myers Residence also serves as headquarters for URHP staff and operations.

54. For URHP, local Underground Railroad history serves as the foundation for extensive engagement with the local community, "especially adults and teens from the marginalized community in which the organization is located." URHP brings its authentic interpretation of history and empowering humanities programming to an audience that is traditionally underserved by museums and historical societies. All of URHP's "humanities programming and activities are designed to encourage and empower people of all ages to be agents of change toward a more equitable and just society."

55. The application details how the growth in URHP's operations and programming, are fast outgrowing the ten-room Myers Residence. URHP increased the number and variety of humanities activities and teen programming, but the indoor programs are necessarily small. With increasing media coverage, participation in its tours has increased, with a 35% increase in group

tour visitors from 2021 to 2022. In 2022, total visitors to the Residence numbered 2,250. URHP increased staff working out of the Residence as it expanded programming.

56.     URHP's collections and artifacts have grown to 27,000 pieces, all stored on the third floor of the Myers Residence. This includes a large collection of archaeological artifacts, all found during archaeological digs on the properties of the Myers Residence and two other prominent members of the local Black community during the 1850s. It also includes 300 original copies of The Liberator, the well-known anti-slavery newspaper published by William Lloyd Garrison and widely circulated before and during the Civil War, as well as several first edition books published in the 1800s, including two by Frederick Douglass. These important collections are stored in a third-floor space that is inaccessible for people with mobility impairments who cannot climb to the third floor.

57.     The Interpretive Center would be built on an empty lot adjacent to the Myers Residence. With the addition of the Interpretive Center, the available space for exhibits, collections, and staff operations would grow from 2,600 square feet (the Myers Residence) to 13,000 square feet. The Center would provide climate-controlled storage space to better preserve and secure URHP's growing collections, as well as dedicated exhibit and research space, all accessible by elevator.

58.     The Interpretive Center would enable URHP to increase its humanities programming by 80% and URHP estimated that the numbers of people who would then tour the adjacent Myers Residence would increase by 200%. Collections and staff offices would all be moved to the Interpretive Center, enabling URHP to fully restore the Myers Residence as a historic home. Already a community anchor, the Center would expand URHP's educational reach, as well as provide new jobs in this economically-challenged neighborhood. In the Challenge Grant

application, URHP detailed its plans to increase its programming, expand areas of research, expand the already-growing national and international reach of its mission, hire further staff, and promote fundraising - all to be facilitated and catalyzed by the Interpretive Center.

59. The Challenge Grant would specifically support construction of the facility's three-floor elevator system, a geothermal HVAC system, and the reassembly and installation of a restored Dutch barn timber frame inside the Interpretive Center on the first floor. Built and used when the State of New York allowed enslavement, and encasing much of the first floor, the barn frame would engage visitors in a transformative historical experience as they enter the Interpretive Center.

60. On February 9, 2024, then-NEH Chair Lowe notified URHP of NEH's offer of funding of up to $250,000 in federal matching funds over a two-year period, provided that URHP raised three times the federal funding (Match Ratio – 1:3). Ex. C (Offer Letter). The Offer Letter confirmed the NEH's careful consideration of the URHP proposal, which included peer review and deliberation by the Council and the Office of the Chair.

61. NEH had already publicly announced this Offer Letter along with 30 other Infrastructure and Building Capacity Challenge Grants and 230 other humanities project grants on January 9, 2024. [16]

---

[16] Nat'l Endowment for the Humanities, *NEH Announces $33.8 Million for 260 Humanities Projects Nationwide,* (January 9, 2024), https://content.govdelivery.com/accounts/USNEH/bulletins/383f0a7. The bulletin provides the link to the full list of grants by geographic location. *National Endowment for the Humanities Grant Awards and Offers, January 2024,* https://www.neh.gov/sites/default/files/inline-files/NEH%20grant%20awards%20January%202024.pdf. Earlier that year, on August 15, 2023, NEH announced $41.3 million in *American Tapestry* grants supporting projects related to climate change and technology, as well as humanities research, books, exhibitions, documentaries, and education programs. Nat'l Endowment for the Humanities, *NEH Announces $413 Million for 280 Humanities Projects Nationwide*, https://www.neh.gov/news/neh-announces-413-million-280-humanities-projects-nationwide (last visited January 12, 2026).

*D.  URHP Accepted and Met all Conditions of the Offer Letter*

62.  The NEH Offer Letter contained funding conditions that URHP raise $750,000 to match the NEH's $250,000 by July 31, 2024 ("Year One") (the allowable fundraising period beginning five months prior to the application deadline May 17, 2023), and another $750,000 by July 31, 2025. The Offer Letter further required an organizational survey, revised budget and work plans, and assurances of compliance with David-Bacon Act labor compensation standards and Buy America, Build America ("BABA") requirements. The Offer Letter further required URHP to meet the requirements of the National Environmental Policy Act ("NEPA") and assist NEH in completing the required review under Section 106 the National Historic Preservation Act of 1966 ("Section 106").

63.  On or about February 22, 2024, URHP accepted the Interpretive Center project award in the manner directed in the Offer Letter.

64.  As required, by May 8, 2024, URHP submitted a full environment assessment and financial review documentation, its organizational survey and lobbying certification, a revised budget, a revised work plan, and assurance of compliance with BABA.

65.  Ahead of schedule, on or about July 13, 2024, URHP certified its matching gifts for Year One. Also in July 2024, URHP submitted environmental information for the construction of the Interpretive Center, as well as a parking study the following January 2025. In December 2024 and February 2025, URHP submitted to the NEH additional information concerning committed funding from other sources.

66.  URHP engaged the services of an archaeology company to further address New York state environmental review requirements and to prepare a report for NEH. URHP reported to NEH in December 2024 that the Environmental Protection Agency ("EPA") awarded a $20

million Community Challenge Grant to seven community-based organizations across the city of Albany. URHP was in the budget for the EPA Community Challenge grant for $3.6 million to be used toward construction of the Interpretive Center.

67. In December 2024, NEH confirmed to URHP that "NEH absolutely sees the value of this project and the benefit that it will bring to the community." NEH informed URHP that it would coordinate the federal NEPA and Section 106 compliance reviews with EPA.

68. NEH communicated nothing further concerning the grant's requirements from the end of January 2024, until May 14, 2025. By then, fifteen months had elapsed since URHP accepted NEH's Offer Letter and URHP had dedicated considerable time, energy and expense to meet NEH's requirements.

69. On May 14, 2025, NEH notified URHP by email that "the offer of federal matching funds for the Challenge Infrastructure and Capacity Building award is being administratively withdrawn," and referred URHP to the Withdrawal of NEH Offer Notice. Ex. D (Withdrawal Notice). The Withdrawal Notice, dated May 6, 2025, was issued by McDonald. It notified URHP that the NEH is withdrawing the award in the Offer Letter effective immediately, and that its decision to withdraw the offer could not be appealed. The Withdrawal Notice stated:

> NEH is repurposing its funding allocations in furtherance of the President's priorities. The President's Executive Order 14217 Commencing the Reduction of the Federal Bureaucracy of February 19, 2025 mandates that the NEH eliminate all non-statutorily required activities and functions. As a federal agency, NEH is required to comply with Executive Orders issued by the President that pertain to activities conducted by the agency. NEH must immediately withdraw its offer to safeguard the interests of the federal government, including its fiscal priorities.

**E.** ***The Withdrawal of URHP's Award was the Result of Illegal Trump Administrative Directives***

70. On January 20, 2025, as URHP was preparing for the construction of the Interpretive Center and fulfilling the conditions of its award offer, President Trump took office.

That very day, President Trump and OMB embarked on their plan to dismantle federal agencies and reorient them to the ideological missions of the administration through a series of EOs and directives.

71.     Among the EOs issued on January 20, 2025, was Executive Order 14151 (EO 14151), *Ending Radical and Wasteful Government DEI Programs and Preferencing.* EO 14151 mandated that within sixty days, under the coordination of OMB, each agency "terminate, to the maximum extent allowed by law, all… 'equity action plans,' 'equity' actions, initiatives, or programs," and all 'equity-related' grants or contracts." Sec. 2(b)(i). Agencies were further directed to provide the Director of OMB a list of all federal grantees who received funding to provide or advance DEI and diversity, equity, inclusion, and accessibility ("DEIA") programs, services or activities since January 20, 2021. Sec. 2(b)(ii)(C). EO 14151 further instructed agency heads to align all grants with the purpose and policy of the executive order, namely, to rescind "illegal and immoral discrimination programs, going by the name 'diversity, and inclusion' (DEI) which has been forced into '"virtually all aspects of the Federal government," a "concerted effort" stemming from President Biden's Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," issued January 20, 2021. Sec. 2(b)(iii)(B).

72.     On January 27, 2025, OMB Acting Director Matthew J. Vaeth issued Memorandum M-25-13 to Heads of Executive Departments and agencies, ordering a pause to all agency grant, loan, and other financial assistance programs. Memorandum M-25-13 stated that appointees in the Executive Branch "have a duty to align Federal spending and action with the will of the American people expressed through Presidential priorities…The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer

dollars…" Each federal agency was directed to "complete a comprehensive analysis of all their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders."

73. Memorandum M-25-13 referred specifically to EO 14151, along with several other orders signed January 20, 2025, as an executive order "to protect the American people and safeguard valuable taxpayer resources." In the interim, agencies were directed to pause all activities related to obligation or disbursement of all financial assistance, and other relevant agency activities, including DEI. Agencies had two weeks in which to submit to OMB detailed information on all programs, projects, or activities subject to the pause.

74. Two federal courts preliminarily enjoined OMB from implementing the provisions of Memorandum M-25-13 pertaining to the funding pause, or "freeze" of disbursements just subsequent to the issuance of the memo.[17] OMB withdrew the memorandum on January 31, 2025.

75. On February 7, 2025, notwithstanding OMB's withdrawal of Memorandum M-25-13, Brett Bobley ("Bobley"), Chief Information Officer for NEH, directed NEH Division Directors to "review criteria for reviewing all the awards from 2021 to the present" as follows:

> As per OMB's January 27, 2025 memo (M-25-13), please identify any funded projects that "advance Marxist equity, transgenderism, or green new deal social engineering policies." More specifically, following the descriptions provided in the Administration's recent Executive Orders, you should identify grants that focus on or promote (in whole or in part): (i) "environmental justice"; (ii) diversity, equity, and inclusion" or "diversity, equity, inclusion, and accessibility" (even if these exact terms are not used); and (iii) "gender ideology," which, according to the Executive Order, replaces sex with "an internal, fluid, and subjective sense of self unmoored from biological facts" or with "an ever-shifting concept of self-assessed gender identity."[18]

---

[17] Dkt. No. 51, *National Council of Nonprofits et al. v. OMB et al.,* Case No: 1:25-cv-00239 (D.D.C. Feb. 25, 2025) and Dkt. No. 161, *State of New York et al v. Trump et al*, Case No: 1:25-cv-00039 (D.R.I. Mar. 6, 2025).

[18] Email from Brett Bobley to NEH Division Directors dated February 7, 2025, 5:39 PM, appended to McDonald Declaration, Dkt. No. 48-3, *Thakur v. Trump et al.,* Case No. 3:25-cv-

76. The February 7 Directive included an NEH award spreadsheet ("NEH Award Spreadsheet"). Ex. E (February 7 Directive). This spreadsheet was a shared, collaboratively editable spreadsheet created and circulated "as the central tool for conducting an inter-agency review of NEH grants pursuant to EOs and the OMB Memorandum M-25-13."[19] The Directive instructed Division Directors to begin their review with awards coming from the November 2024 Humanities Council, then to work their way back to the preceding March 2024 Council, then all remaining awards.

77. McDonald has attested in separate litigation that the February 7 Directive was issued to program directors at the direction of then-Chair Lowe.[20] McDonald further attested that between February 7, 2025 and March 16, 2025, Bobley created a system for staff to mark Biden-era projects on the NEH Award Spreadsheet as either "High, Medium, Low, or No Connection" in terms of the EOs, and communicated this to NEH program directors.[21] McDonald confirmed that "the policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.'[22]

78. Notably, the February 7 Directive ordered NEH Division Directors to identify grants "by following the descriptions provided in the recent Administration's recent Executive

04737-RFL (N.D. Cal. June 19, 2025), p.6.

[19] Dkt. No. 76, *The Author's Guild, et al., v. National Endowment for Humanities, et al.,* Case No. 25-cv-03923 (S.D.N.Y. Dec. 18, 2025), at 20-21.

[20] Dkt. No. 48-3, *Thakur v. Trump et al.,* Case No. 3:25-cv-04737-RFL (N.D. Cal. June 19, 2025).

[21] *Id.*

[22] *Id.*

Orders." However, EO 14151 fails to define in any manner so-called illegal "Diversity, Equity, and Inclusion;" nor does the withdrawn OMB January 27, 2025, memo (M-25-13) define this term.

79. On March 12, 2025, then-Chair Lowe resigned from her position at the direction of President Trump, and McDonald began serving as Acting Chair. Also on or about March 12, 2025, DOGE agents began visiting NEH. DOGE actors recommended dramatically cutting NEH staff and involved themselves in the process for canceling grants made under the Biden administration that had not been fully paid.[23] DOGE staff advised McDonald on terminating grants that violate the Executive Orders.[24] According to reports, McDonald told staff that DOGE wanted to claw back $175 million in undispersed grant money.[25]

80. On March 13, 2025, NEH leadership transmitted the NEH Award Spreadsheet to DOGE, with ratings and comments largely complete to finalize the terminations lists for OMB.[26] NEH made a further "EO deliverable," specifically in response to EO 14151, Section 2(b)(ii)(C), on March 21, 2025.[27]

81. Through the end of March 2025, NEH program staff and leadership continued to assess open grants for supposed conflict with President Trump's executive orders.[28] DOGE staff also informed NEH leadership they must further review grants for termination that NEH staff had deemed not applicable due for DEI.[29] On March 31, 2025, Justin Fox of DOGE emailed McDonald

---

[23] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment*, N.Y. Times (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

[24] Dkt. No. 48-3, Thakur v. Trump, *supra,* p.2.

[25] Elizabeth Blair, *Cultural groups across U.S. told that federal humanities Grants are terminated*, NPR (Apr. 3, 2025), https://www.npr.org/2025/04/03/nx-s1-5350994/neh-Grants-cut-humanities-doge-trump.

[26] Email from Adam Wolfson, NEH to Nate Cavanaugh and Justin Fox, March 13, 2025, 3:17 PM, Dkt. No. 48-3, *Thakur v. Trump*, *supra,* June 19, 2025, p.7.

[27] Dkt. No. 140-2, *Author's Guild v. NEH,* Sept. 29, 2025, at 8.

[28] McDonald Declaration, Dkt. No. 48-3, *Thakur v. Trump, supra,* June 19, 2025, p.6.

[29] Email from Justin Fox to Michael McDonald and Adam Wolfson, March 28, 2025, 11:57

to discuss "a gameplan for effectuating RIFs, grant terminations and contract cancellations by tomorrow AM. We will carry out these plans before the end of the week. We're getting pressure from the top on this."[30] Later that afternoon, McDonald sent NEH's DOGE contacts the last results of NEH's review, excluding "only the one that seem not to conflict with the Administration's priorities – such as the Papers of George Washington."[31]

82. Among the 1,477 grants identified for termination in the NEH Award Spreadsheet were dozens in research, cultural preservation, capital improvements, and programming related to U.S. Black history and communities. *See* Ex. F (Spreadsheets identifying grants to be retained and terminated). Examples include: "Descendant-led Excavation at Reconstruction-Era Black Civil War Veteran Community at Bass St., Fort Negley Park," collecting oral histories and conducting archaeological excavation in Tennessee ($110,374 awarded to Vanderbilt University);[32] "From the Cataract House to Canada: African American Activism and the Underground Railroad in the Niagara River Borderland" ($45,758.00 awarded to SUNY Research Foundation);[33] "The Black Struggle for Freedom Before and After Juneteenth" ($30,000 in remaining funds awarded to the Penn Center), and a total of $291,000 in other awards to programs commemorating Juneteenth;[34] "Emancipation Summer: the Meaning of Freedom in Mississippi" ($29,267 awarded to Shape Up Mississippi);[35] "Abolition Museum Planning Scholar Convenings" ($18,000 awarded to Boston University); "Building Gullah Geechee Resilience to Climate Change Through Spaces of

---

A.M., Dkt. No. 140-2, *Author's Guild v. NEH,* Sept. 29, 2025, at 12.
[30] Email from Justin Fox to Michael McDonald and Nate Cavanaugh, March 31, 2025, 12:52 P.M., Dkt. No. 140-2, *Author's Guild v. NEH,* Sept. 29, 2025, at 11.
[31] Email from Michael McDonald to Justin Fox and Adam Wolfson, March 31, 2025, 4:28 pm, Dkt. No. 140-2, *Author's Guild v. NEH,* Sept. 29, 2025, at 14.
[32] Dkt. No. 140-2, *Author's Guild v. NEH,* Sept. 29, 2025, at 29.
[33] *Id*. at 31.
[34] *Id.* at 32.
[35] *Id.*

Abundance in the Salt Marsh of Sapelo Island," documenting the impacts of flooding, land loss, and sea level rise ($150,000 awarded to University of Georgia);[36] "Resilience and Care in Black Communities: The COVID-19 Pandemic in East St. Louis, Illinois," collecting oral histories ($147,371.00 awarded to University of Illinois);[37] "Identifying, Preserving, and Amplifying Black Appalachian Experiences and Voices in Central Appalachia," documenting and preserving cultural resources ($136,500 awarded to Appalshop);[38] "Cultural and Community Resilience in Gullah/Geechee Nation," oral histories and mapping cultural sites ($80,564 awarded to Regents of University of M[]);[39] "Data Mining and Mapping Antebellum Georgia," using digitized genealogical records and archival maps to identify and locate enslaved African Americans ($23,144 awarded to Georgia State University);[40] "Lucy Terry Prince: African American Experiences in Early Rural New England," production of website examining history of enslaved and free African Americans in colonial and early national periods ($300,00 awarded to Pocumtuck Valley Memorial Association);[41] "Call My Name: The Black Experience in South Carolina from Enslavement to Desegregation," development of traveling exhibition examining the history of African Americans who lived on and worked the land that became Clemson University ($390,908 awarded to Clemson University);[42] "House to Highway: Reclaiming the Hidden History of Jackson Ward," developing an exhibition about the historic of the historic Richmond, Virginia neighborhood ($148, 788 awarded to Library of Virgina);[43] "Freedom on the Move: Building a

---

[36] *Id.* at 33.
[37] *Id.* at 33.
[38] *Id.* at 33.
[39] *Id.;* the name of the university is cut off.
[40] *Id.* at 38.
[41] *Id.*
[42] *Id.* at 40.
[43] *Id.* at 40.

Sustainable Infrastructure for a Comprehensive Database of North American Runaway Slave Ads" ($335,250 awarded to Cornell University);[44] "W.E.B. DuBois," production of a ninety-minute film exploring the life and legacy of African American intellectual W.E.B. DuBois ($47,976 awarded to Media Projects Production); [45]"The Colfax Massacre," production of film examining Reconstruction-era violence between southern whites and African Americans and its legal and social legacy ($700,343 awarded to Media Projects Production).[46]

83.     When implemented in early April 2025, these terminations essentially wiped out all NEH support for Black cultural institutions, and research, education, and programming concerning Black history, terminating 174 grants altogether. Only two grants relating to Black history survived: "The Freedmen and Southern Society Project," a documentary history ($205,000 to [unknown recipient]); and "Fragile Freedoms: Black Revolutionaries in New Hampshire, 1750-1800, development of a statewide traveling exhibition as part of observance of America's 250th anniversary ($25,000 to [unknown recipient]).[47]

84.     None of the forty other remaining grants supported projects relating to indigenous, Hispanic, or other people of color or Native communities. The grants all supported projects relating to largely white male presidents, politicians, writers, scientists, and philosophers, as well as support for historical and educational projects relating to the American Revolution and other aspects of American history, with no references whatsoever to non-white or minority cultures.[48]

---

[44] *Id.* at 52.
[45] *Id.* at 57.
[46] *Id.*
[47] *Id*. at 28. The recipients are not listed for the retained awarded grants.
[48] *Id.* at 27-28. These included the Adams Paper Editorial Project, the Jane Addams Papers Project, the Edison Papers Editorial Project, The Letters of Ernest Hemingway, The Papers of James Monroe, The Papers of U.S. President George Washington 1732-1799, the Papers of Thomas Jefferson, The Papers of Andrew Jackson, The Papers of Abraham Lincoln (relating to his political campaigns), The Late Life Writings of Walt Whitman, The Papers of James

85. On or about April 2, 2025, and April 3, 2025, recipients of NEH grant funding received emailed termination notices informing them their grants had been terminated.

86. DOGE developed the language for the termination letters.[49] The form letters provided the broad reasoning that the grants no longer served the agency's priorities in furtherance of the President's agenda. The letters including the following language that also was included in the Withdrawal Notice to URHP:

Dear NEH Grantee,

This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (_____) effective April 2, 2025, in accordance with the termination clause in your grant agreement.

Your grant no longer effectuates the agency's needs and priorities and conditions of Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2 CFR 200.340. NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminates all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy,* E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities.

87. EO 14217 directed that several federal governmental entities eliminate all "non-statutory components and functions," but did not include NEH.[50] Indeed, McDonald, in multiple declarations, attested that NEH grant termination emails mistakenly referenced EO 14217; rather,

---

Madison, The Papers of Martin Van Buren, The Declaration's Journey, Virginia and the Founding of the Nation," "A New Voice for "Old Ironsides," "Window to the World: U.S.C. Constitution's Around the World Cruise, 1844-1846."

[49] Email from Justin Fox to McDonald, April 1, 2025, 7:55 PM, Dkt. No. 140-2, *Author's Guild v. NEH,* Sept. 29, 2025, at 29.

[50] Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577 (Feb. 25, 2025), https://www.federalregister.gov/documents/2025/02/25/2025-03133/commencing-the-reduction-of-the-federal-bureaucracy. These entities were the Presidio Trust, the Inter-American Foundation, the United States African Development Foundation, and the United States Institute of Peace.

the terminations were carried out pursuant to EO 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative."[51] As discussed above, McDonald confirmed the termination of all NEH grants deemed to violate EOs eradicating "environmental justice," "diversity, equity, and inclusion" or "diversity, equity, inclusion and accessibility," and "gender ideology" from federal grants and operations.

88.     On March 20, 2025, as this process was underway, NEH announced its sea change by posting a webpage entitled "NEH Implementation of Recent Executive Orders." The page stated that NEH was updating the Funding Restrictions section of its NOFOs in order "to comply with several recent Executive Orders, including 'Ending Radical and Wasteful Government DEI Programs and Preferencing,' 'Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,' and 'Ending Radical Indoctrination in K-12 Schooling.'"[52]

89.     By April 10, 2025, 65% of NEH staff had received termination notices, as entire divisions were eliminated consolidated.[53] In support of Plaintiff's motion for preliminary injunction, Richard Roe, an NEH employee, submitted an anonymous declaration to the District

---

[51] Dkt. No. 48-3, *Thakur v. Trump, supra,* p.3; Dkt. No. 32, *Oregon Council for Humanities & Fed. State Humanities Councils v. U.S. Dept. of Govt. Efficiency, et al.,* Case No. 3:25-cv-00829-SI (D. Or. July 15, 2025) n.1, p.3. In other declarations McDonald refers to EO 14214 as the mistaken reference, although the termination notices referenced EO 14217, not 14214. E.g., compare McDonald Declaration Dkt. No. 80, *Author's Guild v. NEH,* June 5, 2025, n.1, at 4, with termination notice, Dkt No. 140-2, Sept. 29, 2025, at 93.

[52] Nat'l Endowment for the Humanities, *NEH Implementation of Recent Executive Orders* (Mar. 20, 2025), https://www.neh.gov/executive-orders (last visited January 26, 2026).

[53] Zac Anderson, *National Endowment for the Humanities Terminates Majority of Staff, Union Says,* USA Today, (April 10, 2025), https://www.usatoday.com/story/news/politics/2025/04/10/trump-administration-guts-national-endowment-for-the-humanities/83032930007/.

Court in *American Council of Learned Societies, et al., v. Michael McDonald, Inc.,* Case No. 1:25-cv-03657 (S.D.N.Y.) describing the decimation across the entire agency.[54]

90.    On April 24, 2025, the NEH issued a press release regarding its reformation: "An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders."[55]

91.    The press release stated that NEH had, in recent weeks, "taken several internal operational steps to improve efficiency, eliminate offices that are not essential to fulfilling its statutory requirements, and to return to being a responsible steward of taxpayer funds."[56] It further stated that NEH had also taken steps to "ensure that all future awards will, among other things, be merit-based, awarded to projects that do not promote extreme ideologies based upon race or gender, and that help to instill an understanding of the founding principles and ideals that make America an exceptional country."

92.    As part of the press release, NEH issued a new "Statement on NEH Priorities" and "Frequently Asked Questions."[57]

93.    The "Statement on NEH Priorities" stated that the NEH was dedicated to supporting exemplary humanities research and programming in service of the American people by investing in the most meritorious proposals for the advancement and dissemination of humanities learning. The NEH announced:

---

[54] Declaration of Richard Roe, Dkt. No. 30, *American Council of Learned Societies, et al., v. McDonald, et al.,* Case No. 1:25-cv-03657-CM (S.D.N.Y. May 14, 2025). This class action litigation challenging NEH grant terminations was consolidated *Author's Guild v. NEH, supra,* and the Court granted preliminary injunction in part. Dkt. No. 116 (July 25, 2025).
[55] Nat'l Endowment for the Humanities, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders*, trump-administration-executive (last visited January 26, 2026).
[56] *Id.*
[57] *Id.*

Moving forward, NEH is especially interested in projects on the nation's semiquincentennial and U.S. history more generally. In addition, the agency will be more finely attuned to its statutory responsibility that "funding should contribute to public support and confidence in the use of taxpayer funds."

As per longstanding agency policy, NEH-supported projects must not promote a particular political, religious, or ideological point of view and must not engage in political or social advocacy. NEH-supported projects should not preference some groups at the expense of others and should ultimately support public purposes.

The principles of intellectual significance, merit, competition, and equal opportunity lie at the heart of NEH's mission.

94. Under its "refocused priorities," NEH stated that it was "especially encouraging projects related to the nation's semiquincentennial and American exceptionalism." Two of the posted "Frequently Asked Questions" (FAQ) addressed the terminated grants:

Q:      Why is NEH cancelling awards?

A: All federal Grantmaking agencies, including NEH, must ensure that taxpayer dollars are spent effectively and are consistent with each agency's mission. This requires that NEH regularly evaluate its finding priorities within the policy framework established by Congress, the Administration, and the head of NEH. Awards and programming must align with these priorities.

Q: What types of awards are being cancelled?

A: In collaboration with the Administration, NEH has cancelled awards that are at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion (or DEI) and environmental justice, as well as awards that may not inspire public confidence in the use of taxpayer funds.

95. The FAQs further explain that the NEH newly included guidance in its NOFO's to restrict DEI and "discriminatory equity ideology" in conformity with President Trump's Executive Orders.[58]

96. NEH has dramatically altered its priorities in direct contradiction of its statutory mandate to make grants that "reflect the diversity and richness of our American cultural heritage"

---

[58] *Id.,* FAQ No.4.

and "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." 20 U.S.C. § 956(c).

97.     In so doing, NEH improperly ignores the statutory priorities Congress set out in 20 U.S.C. § 956, which Congress reaffirmed by allocating additional grant-making funds to NEH in March 2025.

98.     Upon information and belief, as DOGE and NEH eliminated and consolidated its divisions, DOGE and NEH discovered the open Challenge Grants, whose funding was approved but not yet disbursed. Such approved funding included funding for URHP's Interpretive Center. NEH and DOGE applied the same criteria to withdraw these offers as they had applied to the mass terminations for other grants to uplift non-white culture and history in early April.

99.     NEH's May 6, 2025, withdrawal of URHP's award resulted from the February 7 Directive that instructed the review of open grants, in response to Executive Orders and OMB instructions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Fifth Amendment's Equal Protection Guarantee

100.     Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs.

101.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws. The federal government is prohibited from discriminating on the basis of race, as are state governments under the 14th Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

102. Federal actions that discriminate on the basis of race are subject to strict scrutiny. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 217 (1995). A law or policy is discriminatory on its face if it expressly classifies persons on the basis of race.

103. Defendants terminated hundreds of NEH grants based on their racial content, and the Withdrawal of funding for the Interpretive Center supporting Black Underground Railroad History was yet another expressly discriminatory action.

104. Even if the erasure of DEI could be considered facially neutral, such government action violates principles of equal protection "if it was motivated by discriminatory animus and its application results in a discriminatory effect." *Hayden v. Cty. of Nassau,* 180 F.3d 42, 48 (2d Cir. 1999).

105. In assessing discriminatory intent, "the impact of the official action whether it bears more heavily on one race than another may provide an important starting point." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252 (1977)). Courts also must analyze other relevant factors, including "the historical background of the decision … particularly if it reveals a series of official actions taken for invidious purposes, departures from the normal procedural sequence, substantive departures, and the legislative or administrative history especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Id.* (internal quotations and citations omitted). Substantive departures in decision-making may be evidence of improper purposes, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267. "Sometimes a clear pattern, unexplainable on grounds other than race, emerges

from the effect of the state action even when the governing legislation appears neutral on its face."
*Id.* at 266.

107. Defendants' treatment of URHP was motivated by discriminatory animus. This is evident in the widespread terminations of grants supporting the public's understanding of Black history and culture, which immediately preceded the withdrawal of funding from URHP, as well as Defendants' statements that they sought to purge federal funding of initiatives that supported their understanding of diversity, equity and inclusion.

108. In addition, numerous statements of the current Executive Branch leadership reflect overt and coded racism supporting white supremacy and denigrating Black history in America. *See, e.g., Administration Social Media Posts Echo White Supremacist Messaging*, New York Times, January 27, 2026, available at: https://www.nytimes.com/2026/01/27/us/politics/white-supremacy-trump-administration-social-media.html; *Trump 'OK' with DC statue honoring Civil War leader who fought for slavery: 'Lot of people in this room' agree,* The Independent, October 16, 2025, available at: https://www.independent.co.uk/news/world/americas/us-politics/trump-ballroom-dinner-robert-e-lee-statue-b2846627.html.

109. At the close of trial in the U.S. District Court for the District of Massachusetts, over NIH and DOGE's terminations of NIH grants, Judge William Young found pervasive racial discrimination in selecting NIH grants for termination pursuant to EO 14151.[59] Referring to the

---

[59] *American Public Health Association, et al., v. National Institutes of Health, et al.,* 791 F.Supp.3d 119 (D.Ma. 2025), n.5. The Court made a factual finding of racial discrimination, but did not proceed to issue formal findings supporting an injunction.

termination of grants for research related to racial minorities pursuant to EOs mandate to eliminate DEI and agency directives, Judge Young stated, "I am hesitant to draw this conclusion — but I have an unflinching obligation to draw it — that this represents racial discrimination… I would be blind not to call it out. My duty is to call it out.[60]… I've never seen a record where racial discrimination is so palpable."[61]

110. Defendants' actions in terminating and withdrawing grants, including the Withdrawal of Plaintiff's award, were neither narrowly tailored nor motivated by a compelling state interest.

111. Through the actions above, Defendants have violated the Equal Protection Clause of the Fifth Amendment.

**SECOND CLAIM FOR RELIEF**
**Violation of the First Amendment**

112. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs.

113. The First Amendment provides that the federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

114. The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v.*

---

[60] Dkt. No. 143, *supra,* at 83.
[61] *Id.* at 85.

*Vullo*, 602 U.S. 175, 187 (2024). The government may not "use [its] power . . . to punish or suppress disfavored expression." *Id*.

115. "[E]ven in the provision of subsidies, the Government may not 'ai[m]at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983) (alteration in original)). In the grant-making context, the government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No.25-cv-79-WES, 2025 WL 1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

116. URHP's stated mission is to research and preserve "the local and national history of the Underground Railroad movement, its international connections, and its legacy to today's social justice issues, thereby empowering people of all ages to be agents of change toward an equitable and just society."

117. Defendants have expressly stated that their goal in terminating and withdrawing NEH funding for certain organizations and projects is to eliminate projects that promote their unknown definition of diversity, equity and inclusion – that is, exactly the mission that Plaintiff pursues in being "agents of change toward and equitable and just society."

118. Defendants' withdrawal of its offer of funding to URHP to disadvantage or promote specific political and ideological viewpoints is "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. In an effort to drive views they disfavored out of the marketplace of ideas, Defendants withdrew its offer of funding based on URHP's viewpoint.

119. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered concrete economic and non-economic harm, including loss of funding, loss of funding opportunities, loss of access to federally funded programs and resources, loss of investments, costs of mitigation, diversion of resources, reputational harm, and chilled association.

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**

120. The APA directs courts to "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C).

121. As the Supreme Court explained in *National Institutes of Health v. American Public Health Association*, 606 U.S. ----, 145 S. Ct. 2658, (2025), federal district courts maintain the power and jurisdiction to set aside agency guidance, including where that guidance discusses internal policies related to grants. *Id*. at 2660 (Barrett, J., concurring).

122. The February 7 Directive constituted final agency action to eradicate DEI and the other targeted topics of EO 14151, within the required timeline of sixty days.

123. The February 7 Directive led to both to massive grant terminations in early April 2025 and the withdrawal of Challenge Grant offers in May, including the Withdrawal of Plaintiff's award.

124. The February 7 Directive was contrary to law because it violated the statutory mission of the NEH to support diverse viewpoints, the diverse experiences of American history, and reaching underserved populations.

125. The February 7 Directive was arbitrary and capricious and was not based on any reasonable assessment of NEH grants and programs within the statutory framework and mission of NEH.

126. The February 7 Directive was not in observance of procedures required by law

127. Setting aside the February 7 Directive, which directly led to the Withdrawal of Plaintiff's award, will redress Plaintiff's harms.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and award Plaintiff the following relief:

A. Declare as unlawful and set aside Defendants' Withdrawal of its offer of funding to Plaintiff, as violative of the Constitutional First Amendment protections of free speech and Fifth Amendment equal protection guarantee;

B. Declare as unlawful and set aside the February 7 Directive as violative of the APA;

C. Award Plaintiff and counsel reasonable costs and attorneys' fees; and

D. Issue such other relief as the Court deems just and proper.

Dated: March 20, 2026         **UNDERGROUND RAILROAD HISTORY PROJECT OF THE CAPITOL REGION**
*By Counsel*

/s/ Nina Loewenstein
Nina Loewenstein (NDNY Bar. #511043)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
(272) 230-2597
nloewenstein@lawyersforgoodgovernment.org

/s/ Gary DiBianco
Gary DiBianco (Application for *Pro Hac Vice* Forthcoming)
LAWYERS FOR GOOD GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
(404) 913-5529
gdibianco@lawyersforgoodgovernment.org


/s/ Michael Siris
Michael Siris (Application for *Pro Hac Vice* Forthcoming)
LAWYERS FOR GOOD GOVERNMENT
100 Quentin Roosevelt Blvd
Garden City, NY 11530
(516) 228-9350
msiris@lawyersforgoodgovernment.org